**08 C 416**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| MORRIS FIDDLER, individually and on behalf of a class of similarly situated individuals, ) ) ) Plaintiff, ) ) v. ) ) AT&T MOBILITY, LLC d/b/a The New AT&T ) f/k/a CINGULAR WIRELESS, a Delaware limited ) liability company, M-QUBE, INC., a Delaware ) corporation, and VERISIGN, INC., a Delaware ) corporation. ) ) ) Defendants. ) | 07CH37212<br><br>No.<br>**JUDGE DER-YEGHIAYAN**<br>**MAGISTRATE JUDGE KEYS**<br><br>FILED CH-2802 DEC 17 2007 DOROTHY BROWN CLERK OF THE CIRCUIT COURT OF COOK COUNTY, IL<br><br>**Jury Trial Demanded** |

### CLASS ACTION COMPLAINT

1.  Plaintiff Morris Fiddler brings this class action complaint against Defendant AT&T Mobility, LLC d/b/a The New AT&T f/k/a Cingular Wireless ("AT&T"), Defendant VeriSign, Inc. ("VeriSign") and Defendant m-Qube, Inc. ("m-Qube") seeking to stop Defendants' unlawful practice of charging cellular telephone customers for products and services the customers have not authorized, a practice which has resulted in Defendants unlawfully collecting money from consumers statewide, and to obtain redress for all persons injured by their conduct. Plaintiff, for his class action complaint, alleges as follows upon personal knowledge as to herself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### PARTIES

2.  Plaintiff Morris Fiddler is a citizen of Illinois.

1


EXHIBIT A

3. Defendant AT&T Mobility, LLC d/b/a the new AT&T Wireless ("AT&T") f/k/a Cingular Wireless is a leading provider of cellular telephone service in the United States. AT&T is a Delaware limited liability company with its headquarters and principal place of business in the State of Georgia. AT&T does business and has offices throughout the State of Illinois and this County.

4. Defendant m-Qube, Inc. ("m-Qube"), a self-proclaimed "leading mobile channel enabler," is an "aggregator" and operates a mobile transaction network that processes mobile payments on its behalf and on behalf of carriers, other aggregators and third party mobile content providers. m-Qube is a Delaware corporation with its headquarters and principal place of business in the State of California. m-Qube does business throughout the State of Illinois and this county.

5. Defendant VeriSign, Inc. ("VeriSign") is an aggregator with a self-proclaimed "market-leading portfolio of managed communications and content offerings" whose operations have become essentially merged with those of its subsidiary m-Qube. In May 2006, VeriSign acquired m-Qube and has since integrated and operated many of m-Qube's aggregator systems including, but not limited to, those processing communications and/or mobile content charges that are the subject of this suit. VeriSign is a Delaware corporation with its headquarters and principal place of business in the State of California. VeriSign does business throughout the State of Illinois and this county.

**VENUE**

5. Venue is proper in Cook County because Defendants do business in Cook County.

**CONDUCT COMPLAINED OF**

2

6. This case arises from two closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including -- most significantly for present purposes -- "premium" text message services. These services, also known as "mobile content" include products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio and participatory television).

7. The second underlying phenomenon of this case constitutes its very core. That is, just as providers of premium mobile content deliver their products by means of cell phone technology, they likewise charge and collect from their customers by "piggybacking" on the cell phone bills sent out by the wireless carriers, such as AT&T. Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of third-party companies, such as m-Qube, known as aggregators. These aggregators act as middle-men, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services to the mobile content providers by retaining a substantial percentage of the amount each premium mobile content transaction.

8. The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. That flaw -- understood, perpetuated, and even encouraged by carriers, aggregators, and mobile content providers such as the instant defendants -- is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established by companies

3

including Defendants in aid of the premium mobile content industry that enriches them are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

9. As Defendants also know, significant amounts of money have been collected on account of such unauthorized charges for premium mobile content in the industry over the last few years. And while it has always been within the power of companies such as Defendants to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed Defendants have reaped and retained their respective shares of the improper collections.

10. While the total sales in Illinois of premium mobile content in 2007 amount to a significant sum, the business is still in its infancy. The burgeoning industry has already expanded from ordinary ringtones into mass media-related products such as interactive radio and participatory voting at television and concert events and, most recently, into services that enable cell phones to function as credit cards. Unchecked, Defendants' practices will injure an ever-increasing number of unwitting consumers, inflicting damages of an untold magnitude.

11. Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only thing a mobile content provider needs to charge a consumer for its products is the consumer's cellular telephone number. Once a mobile content provider has a consumer's cell phone number, it can cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

12. Armed with only a cell phone number, the mobile content provider can simply provide that number, along with an amount to be charged, to a billing aggregator (such as m-

Qube). The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that cell phone number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

13. Because the protections normally present in consumer transactions -- such as signatures and private credit card numbers -- are absent from this process, the likelihood of false charges increases enormously. And because a substantial part of mobile content "sales" are effected through web sites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude. Mobile content providers have powerful financial incentives to collect as many cell phone numbers as possible but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

**Aggregators' Role In the Scheme to Defraud**

14. In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to wireless carriers' mobile communications networks and frequently do so by "partnering" with aggregators -- intermediary companies such as VeriSign and m-Qube that offer content providers (its "content provider partners") direct access to the carriers through existing relationships. This allows content providers to focus on developing and marketing branded content, applications and programs while aggregators manage the complex carrier relationships, distribution, billing and customer service.

15. As aggregators, VeriSign and m-Qube operates a mobile transaction network that helps companies develop, deliver, and bill for mobile content services to compatible mobile devices throughout the State of Illinois and the nation.

16. By using their end-to-end technology platforms, their relationships with U.S. carriers, and other value-added services, these aggregators have forged a crucial link between the wireless carriers and the mobile content providers. They have enabled the transformation of wireless into a marketing, content delivery, and collections process, while carving out a profitable role for themselves as very critical middlemen in this rapidly growing industry.

17. m-Qube and VeriSign have developed a vast distribution system that integrates into the wireless networks of some of the largest wireless carriers nationwide, providing direct connections to more than 500 mobile operators, including AT&T, Cellular One, Sprint Nextel, Alltel, US Cellular, among many others. As a result, m-Qube and VeriSign are able to reach and bill wireless subscribers nationwide.

18. While aggregators such as m-Qube charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill cell phone subscribers: each time a charge is incurred in connection with the purchase of mobile content services offered by a content provider, the aggregator and/or the content provider cause said charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

19. The carrier then bills and collects the charge from its current subscriber, retains about a portion of the proceeds as its "revenue share" and then remits the balance to the aggregator who has direct access to its network, e.g., m-Qube, who retains a percentage of the balance in the form of its own "revenue share," and then remits the remainder directly to the mobile content provider (or, in some instances, to another aggregator who then retains a

6

percentage of the balance in the form of its own "revenue share" and then remits the balance to its mobile content provider client).

20. m-Qube and VeriSign have in Illinois registered numerous transactions and processed significant amounts of dollars in transactions over recent years and have profited greatly from their arrangement with their carrier partners, aggregator partners and content provider partners.

21. As m-Qube knows, carriers such as AT&T routinely process charges for mobile content that have not been authorized by the charged party.

22. m-Qube has not only sanctioned this illegal billing, they have promoted it by negotiating and facilitating partnerships between the carriers and the mobile-content providers that contains few if any safeguards to prevent unauthorized charges.

23. Indeed, if Defendants wanted to end this illegal billing, they could do so in an instant. All they would have to do to ensure that they are obtaining the consent of the charged party is agree to process a unique "access code" for each customer account, provided by the carrier to the account holder and his/his authorized representatives at the time it is opened, and require that it be produced anytime a third-party attempts to charge the account. If a matching access code is not provided, no charges would be included on the customer's billing statement.

24. But instead of implementing such a simple safeguard, Defendants have intentionally created and maintained a system that encourages fraud at every step. Such system constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

### The Carrier's Role In the Scheme to Defraud

25. AT&T uses uniform form contracts ("Service Agreements") under which customers purchase cell phone services.

26. As described above, AT&T's services include providing access to and billing for various third-party mobile content services such as ring tones, chat services, horoscopes, stock tips, weather alerts, participatory television, mobile payment services and other forms of software provided by hundreds of third-party vendors with names such as Ringaza and many others.

27. AT&T has contracted with third-party providers such as Defendant m-Qube to bill and collect from AT&T's customers the services provided by such third-party content providers, the charges for which are included directly on a customer's monthly wireless bill.

28. The duty of good faith and fair dealing, a part of every contract, requires that AT&T not bill any customer for any good or service not authorized by the customer.

29. Upon execution of said Service Agreements and activation of cellular telephone accounts, AT&T provides its customers a ten-digit cellular telephone number.

30. As explained above, unbeknownst to its customers, AT&T frequently charges consumers for services that were never authorized.

31. As a result, AT&T has for years been systematically, repeatedly and without authorization, billing its customers for purchase of products and services not agreed to by those customers. AT&T and third-party service providers have, on information and belief, profited significantly through this practice.

32. AT&T's conduct is by no means accidental. As previously alleged, it knows that many of its cellular telephone customers dispute the claim the mobile content provider's claim that such customer consented to be charged for their mobile content services. AT&T further

knows that it cannot authenticate such customer's authority to be billed for such mobile content charges. In light of its knowledge of these facts, AT&T's decision to continue to charge its customers for mobile content without taking steps to authenticate the representations of the mobile content providers that the customer's authority to be charged was obtained constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

33. Because the amount AT&T is taking is small on an individual basis – as little as a few dollars to at most several hundreds of dollars per person -- and because of AT&T's vast resources and superior bargaining power, Defendants employ this scheme with the hope and expectation that its illegal conduct will go unpunished.

### THE FACTS RELATING TO THE NAMED PLAINTIFF

34. In or about 2006, Plaintiff purchased new cell phone service for his family's personal use from an authorized AT&T sales representative.

35. On that same day, in exchange for an AT&T cellular telephone service plan, Plaintiff agreed to pay AT&T a set monthly fee for a period of 12 months.

36. Upon activating his cellular telephone account, AT&T provided Plaintiff with a cellular telephone number.

37. Beginning on or about October, 2007 and continuing through at least November, 2007, Plaintiff's cell phone account was charged for unwanted mobile content services in the form of "premium" text messages from Defendants.

38. At no time did Plaintiff authorize the purchase of these products and services offered by Defendants and at no time did Plaintiff consent to m-Qube and/ VeriSign's sending of text messages to his cellular telephone.

39. During the relevant time period, Defendants caused Plaintiff to be charged service fees for so-called "Premium" text messages provided by Defendants.

40. At no time did Plaintiff authorize Defendants or anyone else to bill his for these charges.

41. AT&T has yet to provide Plaintiff a full refund of the unauthorized charges consisting of the premium text message charges, ordinary text messages, data charges, back interest and/or an assurance that such unauthorized charges would not appear in future billing periods.

**CLASS ALLEGATIONS**

43. Plaintiff brings this action on behalf of herself and two classes. Those classes are defined as follows:

A. The "Carrier Class": a class consisting of all AT&T wireless telephone subscribers in Illinois who suffered losses or damages as a result of AT&T billing for mobile content products and services not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the defendants, and (ii) any employee of a defendant.

B. The "Aggregator Class": a class consisting of all wireless telephone subscribers in Illinois who suffered losses or damages as a result of incurring charges on their cellular telephone bills from or on behalf of m-Qube and/or VeriSign not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the defendants, and (ii) any employee of a defendant.

44. The claims of Plaintiff are typical of the claims of all of the other members of the respective Classes.

10

45. Plaintiff will fairly and adequately represent and protect the interests of the other members of the respective classes. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Classes.

46. Absent a class action, most members of the Classes would find the cost of litigating their claims to be prohibitive, and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

47. Defendants have acted and failed to act on grounds generally applicable to the plaintiff and the other members of the respective Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes.

48. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the respective Classes are the same, resulting in injury to the Plaintiff and to all of the other members of the Classes. Plaintiff and the other Class members have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

49. There are many questions of law and fact common to the claims of Plaintiff and the other members of the respective Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Carrier Class include but are not limited to the following:

    (a)    Whether AT&T's conduct described herein is in breach of contract.

(b) Whether AT&T's conduct described herein violates Computer Tampering in Violation of 720 ILCS 5/16D-3.

(c) Whether AT&T's conduct described herein violates Illinois Consumer Fraud and Deceptive Business Practices Act.

50. Common questions for the Aggregator Class include:

(a) Whether m-Qube and/or VeriSign has unjustly received money belonging to Plaintiff and the Aggregator Class and whether under principles of equity and good conscience, m-Qube should not be permitted to retain it;

(b) Whether m-Qube and/or VeriSign tortiously interfered with contracts between Plaintiff and the Aggregator Class, on the one hand, and their wireless carriers, on the other hand, by causing them to be charged for products and services by their carrier that were unauthorized.

(c) Whether m-Qube's and/or VeriSign's conduct described herein violates Computer Tampering in Violation of 720 ILCS 5/16D-3.

(d) Whether m-Qube's and VeriSign's conduct described herein violates Illinois Consumer Fraud and Deceptive Business Practices Act.

**COUNT I**
**(Breach Of Contract on behalf of the Carrier Class)**

51. Plaintiff incorporates by reference the foregoing allegations.

52. Plaintiff and the Carrier Class entered into substantially identical agreements with Defendant AT&T whereby Plaintiff and the AT&T agreed to pay a certain sum of money in

12

exchange for AT&T's activation of Plaintiff and the AT&T's cellular telephone account and its promise to provide various communication and related services to Plaintiff and the Carrier Class.

53. Defendant AT&T expressly and/or impliedly agreed to provide Plaintiff and the Carrier Class with a cellular telephone number free of unauthorized charges for third-party products and services.

54. Defendant AT&T further expressly and/or impliedly agreed to bill Plaintiff and the Carrier Class only for products or services the purchase of which they had authorized.

55. Defendant AT&T further expressly and/or impliedly agreed to carry out its obligations in good faith and fair dealing.

56. Defendant AT&T breached its contractual obligations by providing Plaintiff and the Carrier Class with cellular telephone accounts that included unauthorized charges for mobile content.

57. Defendant AT&T further breached its contractual obligations, including its contractual obligation of good faith and fair dealing, by thereafter billing Plaintiff and the Carrier Class for products or services, the purchase of which they never authorized.

58. The aforementioned breaches of contract have proximately caused the Plaintiff and the other members of the Carrier Class economic injury and other damages.

**COUNT II**
**(Restitution/Unjust Enrichment on behalf of the Aggregator Class)**

60. Plaintiff incorporates by reference the foregoing allegations.

61. A benefit has been conferred upon m-Qube and VeriSign by Plaintiff and the Aggregator Class. VeriSign and m-Qube has received and retain money belonging to Plaintiff

and the Aggregator Class resulting from their billing and collecting significant sums of money in unauthorized mobile content charges.

62. m-Qube and VeriSign appreciate or have knowledge of said benefit.

63. Under principles of equity and good conscience, m-Qube and VeriSign should not be permitted to retain the money belonging to Plaintiff and the Aggregator Class which m-Qube and VeriSign has unjustly received as a result of its actions.

**COUNT III**
**(Tortious Interference with a Contract on behalf of the Aggregator Class)**

64. Plaintiff incorporates by reference the foregoing allegations.

65. Plaintiff and the Aggregator Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to Plaintiff and the Aggregator Class and to bill Plaintiff and the Aggregator Class only for products or services the purchase of which they had authorized.

66. m-Qube and VeriSign knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

67. m-Qube and VeriSign intentionally interfered with said contractual relationship through improper motives and/or means by knowingly and/or recklessly continually causing to be placed on the cellular telephone bills of cellular telephone owners across the nation unauthorized charges.

68. Plaintiff and the Aggregator Class suffered loss as a direct result of the conduct of m-Qube and VeriSign.

**COUNT IV**

14

**(Computer Tampering in Violation of 720 ILCS 5/16D-3 on behalf of both Classes)**

69. Plaintiff incorporates by reference the foregoing allegations.

70. The cellular phones owned by Plaintiff and the other class members are sophisticated electronic devices which accept, process, store, retrieve and output data, and contain many (if not most) of the same capabilities and equipment as traditional desktop computers (in addition to cellular radio signal processing technology). These cellular phones are computers under the definition of 720 ILCS 5/16D-2(a).

71. Likewise, the mobile content alleged in this Complaint is a program under the definition of 720 ILCS 5/16D-2(b); a series of coded instructions or statements accepted by class members' cellular phones, which cause the computer to process data and supply the results of the data processing (by, inter alia, displaying the mobile content).

72. Plaintiff and the other class members' cellular service will be terminated unless they pay additional fees for the receipt of the unauthorized mobile content, whether they authorized that mobile content or not. Through the conduct alleged above, Defendants violate 720 ILCS 5/16D-3(a)(4) by knowingly participating in and/or facilitating the insertion of mobile content into class members' cellular phones without the permission of the cellular phones' respective owners, knowing and/or having reason to believe that the insertion of the unauthorized mobile content will or may cause loss to the users of that cellular phone.

74. Plaintiff and the other class members are damaged by those violations. Defendants' violations of 720 ILCS 5/16D-3(a)(4) cause the Plaintiffs and the other class members to pay charges for mobile content services to which they did not consent. Defendants' violations of 720 ILCS 5/16D-3(a)(4) further damage Plaintiffs and other class members by

15

causing them to pay falsely inflated cellular service bills to the carrier Defendant, as well as the lost time required to sort, read, discard and attempt to prevent future charges for unwanted mobile content services, and lost storage space, connectivity, and computing resources on the cellular phones.

75.    Plaintiff, on his own behalf and behalf of the other class members, seeks appropriate relief (including damages in an amount to be determined at trial, and injunctive relief or other equitable relief, such as an accounting, and disgorgement of fees obtained while these violations were ongoing), as well as reasonable attorney's fees and other litigation expenses, against Defendants under 720 ILCS 5/16D-3(c).

**COUNT V**
**(Violations of the Illinois Consumer Fraud and Deceptive**
**Business Practices Act on Behalf of both Classes)**

76.    Plaintiff incorporates by reference the foregoing allegations.

77.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares unlawful "any [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

78.    Defendants violated, and continue to violate this proscription through their conduct alleged above, as set forth above.

79.    Defendants, through their acts of unfair competition, have obtained money from Plaintiff and members of the proposed Classes. Plaintiff and the members of the Classes ask that

this Court restore this money to Plaintiff and enjoin Defendants from continuing their illegal practices.

80. Such conduct is ongoing and continues to this date. Plaintiff, the Class members and the general public are therefore entitled to the relief described herein.

WHEREFORE, Plaintiff Morris Fiddler, on behalf of himself and the Classes, prays for the following relief:

    a. Certify this case as a class action on behalf of the Classes as defined above and appoint Morris Fiddler Class Representative, and appoint KamberEdelson, LLC as lead counsel;

    b. Declare that the actions of AT&T, as set out above, constitute a breach of contract;

    c. Enter judgment against AT&T for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct, and if its conduct is proved willful, award Plaintiff and the Carrier Class exemplary damages;

    d. Declare that the actions of m-Qube and VeriSign, as set out above, constitute unjust enrichment and tortious interference with a contract;

    e. Enter judgment against m-Qube and VeriSign for all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct, and if its conduct is proved willful award Plaintiff and the Aggregator Class exemplary damages;

    f. Declare that the actions of m-Qube, VeriSign and AT&T, as set forth above, as well as in other respects, constitute a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and Computer Tampering in Violation of 720 ILCS 5/16D-3.

    g. Award Plaintiff and the Classes reasonable costs and attorneys' fees;

    h. Award Plaintiff and the Classes pre- and post-judgment interest;

    i. Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Classes; and

j.  Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

December 17, 2007

Morris Fiddler, individually and on behalf of a class of similarly situated individuals

*[signature]*
One of his attorneys

Jay Edelson
Myles McGuire
John Blim (Of Counsel)
KAMBEREDELSON, LLC
53 West Jackson Boulevard
Suite 1530
Chicago, Illinois 60604
Telephone: (312) 589-6370
Firm ID: 44146