JAY EDELSON
MYLES MCGUIRE
ELIZABETH MACKEY (*PENDING PRO HAC VICE*)
JOHN BLIM (Of Counsel)
KAMBEREDELSON, LLC
53 West Jackson Boulevard, Suite 1530
Chicago, Illinois 60604
Telephone: (312) 589-6370
Facsimile: (312) 873-4610


ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| MORRIS FIDDLER, individually and on behalf of a class of similarly situated individuals,<br><br>              Plaintiff,<br><br>v.<br><br>AT&T MOBILITY, LLC d/b/a The New AT&T f/k/a CINGULAR WIRELESS, a Delaware limited liability company, M-QUBE, INC., a Delaware corporation, and VERISIGN, INC., a Delaware corporation,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. CV 08 C 416<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO REMAND**<br><br><br><br>**CLASS ACTION** |

## I. **Introduction**

In their removal papers, Defendants m-Qube, Inc. and VeriSign, Inc. ("Defendants") claim

that the amount in controversy in this action exceeds $5,000,000. (Notice of Removal ¶4.)[1]

---

[1] Defendant AT&T Mobility, Inc. did not join in Defendants m-Qube and VeriSign in this notice of removal.

However, in support of this claim, Defendants do little more than point to Morris's allegation that Defendants have "collected *significant* sums of money in unauthorized charges" and opine that a total damage award and the costs of complying with injunctive relief "would appear to be substantial." (Notice of Removal ¶¶23, 26, 29). Therefore, Defendants have failed to meet their burden of proof, and removal was improper. Further, because Defendants "lacked an objectively reasonable basis for seeking removal," Defendants should be required to pay Plaintiff's fees and expenses in bringing this motion.

## II. <u>Facts</u>

Plaintiff Morris Fiddler ("Fiddler"), on behalf of himself and two classes, brings the underlying action against Defendants seeking to stop Defendants' practice of causing cellular telephone customers to be billed for unauthorized mobile content services, and to obtain redress for all persons injured by their conduct.

Mobile content services, also known as premium text message services, include basic services, such as ring tones, sports score reports, and weather alerts that are delivered to a user's cellular telephone; mobile content services also include advanced services, such as direct payment services and interactive radio. (Compl. ¶6.) In order to reach consumers, mobile content service providers must obtain access to cellular telephone carriers' mobile communications networks, for example, the mobile communications network of Defendant AT&T. (Compl. ¶14.)

To obtain access to the carriers' networks, the service providers partner with aggregators, such as Defendants VeriSign and m-Qube, which act as middlemen between the numerous service providers and the much larger carriers. (Compl. ¶¶7, 14.) The aggregators negotiate agreements between the mobile content service providers and the carriers, and these agreements allow the service providers to access the carriers' wireless communications networks and to use the carriers' billing and collection mechanisms. (Compl. ¶¶7, 14.)  As a result of these agreements, the aggregator and/or the content provider cause charges for mobile content service purchases to be billed directly on the cell phone bill of the carrier's customer who purportedly

owns the telephone number associated with the purchase. (Compl. ¶18.) Both the aggregator and the carrier retain a portion of the mobile content service charge collected. (Compl. ¶¶18-19.)

Morris's claims stem from: (1) the manner in which Defendant AT&T has set up and maintained its billing system, a billing system which results in unauthorized and erroneous charges for mobile content services being placed on customers' bills; and (2) the manner in which Defendants m-Qube and Verisign knowingly sanction and promote this illegal billing system. (Compl. ¶¶8-9, 21-22.) Specifically, Defendant AT&T's billing system does not require mobile content service providers or aggregators, including Defendants m-Qube and VeriSign, to provide any information beyond a customer's cell phone number before causing that customer to be billed for services and products. (Compl. ¶¶10-11.) Charges for mobile content services often appear with minimal, cryptic identifying information on a consumer's bill. (Compl. ¶11.) The conspicuous lack of any kind of safeguard—even a simple safeguard such as requiring a customer's signature or private access code—in this billing system (a system which benefits all the named Defendants in this suit) has led to repeated, systematic unauthorized charges being placed on consumers' bills. (Compl. ¶¶11-12, 31.) Named plaintiff Morris, for example, had his cell phone account charged for unwanted mobile content services beginning in October 2007 through at least November 2007. (Compl. ¶37.)

## III.    **Applicable Statutory Law**

CAFA provides, putting aside certain exceptions that are not applicable, "the district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," there are at least 100 members of the putative class, and at least one member of the putative class is a citizen of a state different from the defendant. 28 U.S.C. § 1332(d).

## IV.    **Argument**

### A. Removal statutes such as 28 U.S.C. § 1332(d)(2) are strictly construed.

Removal statutes are to be "construed narrowly and any doubts about the propriety of removing a particular action should be resolved against allowing removal." *Wirtz Corp. v. United Distillers & Vintners N. Am., Inc.*, 224 F.3d 708, 715-16 (7th Cir. 2000). *See also Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108, 61 S. Ct. 868, 872, 85 L. Ed. 1214 (1941)(removal statutes are construed strictly); *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993)("Courts should interpret the removal statute narrowly and presume that the plaintiff may choose his or her forum."); and *Vivas v. Boeing Co.*, 486 F. Supp. 2d 726, 734 (N.D. Ill. 2007)(removal statute should be narrowly construed).

### B. Defendants have failed to meet their burden of proving by a preponderance of the evidence that the amount in controversy exceeds $5,000,000.

It is well established that the proponent of federal jurisdiction bears the burden of establishing removal jurisdiction. *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447-448 (7th Cir. 2005), citing *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 607 (7th Cir.1997) and *Smith v. American General Life & Accident Insurance Co.*, 337 F.3d 888, 892 (7th Cir. 2003). "Whichever side chooses federal court must establish jurisdiction; it is not enough to file a pleading and leave it to the court or the adverse party to negate jurisdiction." *Brill*, 427 F.3d at 447. CAFA has not shifted this burden. *Id.* at 448.

A removing party must prove by a preponderance of the evidence that the amount in controversy exceeds the threshold in order to meet this burden. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536 , 541-42 (7th Cir. 2006). "[P]art of the removing party's burden is to show not only what the stakes of the litigation could be, but also what they *are* given the plaintiff's actual demands." *Brill*, 427 F.3d at 449. Therefore, as the removing party, Defendant bears the burden of establishing by a preponderance of the evidence that the amount in

---

controversy exceeds $5,000,000 in order to establish removal jurisdiction. In the instant case, Defendants have failed to meet this burden.

First, Defendants point to the portions of Morris's complaint alleging that Defendant AT&T and the service providers have "profited *significantly*" through their billing practices, and that Defendants m-Qube and VeriSign have improperly "collected *significant* sums of money in authorized charges." (Notice of Removal ¶23.) However, Defendants' italicization of the word "significant", an adjective not specifying any numerical quantity, much less the numerical quantity of $5,000,000, does not bring them anywhere near meeting their burden.

Next, Defendants point to Morris's claims against "three separate defendants" for "multiple theories of liability" which "seek[] [] broad and far-reaching relief. . . ." (Notice of Removal ¶24.). Defendants similarly argue that "the total amount of any award against the m-Qube Defendants . . . would appear to be substantial"; their costs of complying with injunctive relief "would appear to be substantial"; and, in addition, the amount of any award against Defendant AT&T, as well as AT&T's costs of complying with injunctive relief [2], "would appear to be substantial." (Notice of Removal ¶¶26, 29.)  The fact that there are multiple defendants, more than one theory of liability, and that this case seems big, says nothing concrete about the amount of money at stake in this controversy, let alone establish by a preponderance of the evidence an amount in excess of $5,000,000.

Likewise, Defendants gain no help by pointing out that Morris's claims allege "systematic[] [and] repeated[]" conduct for a period of years. (Notice of Removal ¶25.) Without knowing either how many consumers may have been improperly billed or the average amount of a consumer's improper bill, it simply does not follow that there is $5,000,000 at issue because "systematic[] [and] repeated[]" charges were placed on consumers' telephone bills for years.

---

[2] Defendants make no attempt whatsoever to quantify how much complying with an injunction order might cost them. In addition, Defendants do not attempt to refute Morris's claims that Defendants could stop their illegal billing practices simply by ensuring that they are obtaining the consent of the charged party through, for example, processing a unique access code, to be provided by Defendant AT&T to each account holder at the time his/her account is opened. (See Compl. ¶23.)

Indeed, Morris claims he was improperly billed by Defendants for "unwanted mobile content services." Even a cursory review of Plaintiff's billing records would indicate that the total amount of charges for such services does not exceed $100. Even if there were 10,000 class members in this case, that would mean the average class member would need to have suffered $500 in damages in order to reach the jurisdictional amount.

Defendants next attempt a transparent "sleight of hand" by averring that that Defendant VeriSign has charged its Illinois consumers in excess of $5,000,000 for premium content. That claim – even if properly substantiated[3] -- says nothing about the amount of money collected based on unauthorized charges, which is the only practice at issue in this case. That's akin to a debate on the scope of illegal immigration in the U.S. and stating that the total number of U.S. immigrants (both legal and illegal) combined last year was "X". Defendants have failed to identify even a single indicator, such as the percentage of records reflecting customer complaints about such charges, which may reasonably approximate the amount of the *unauthorized* portion of the total charges.

Defendants also point to potential punitive damages and attorneys' fees in their attempt to establish that the amount in controversy exceeds $5,000,000. (Notice of Removal ¶¶30-31.) However, amounts for punitive damages are derived from the amount of compensatory damages awarded. See *Buller v. Owner Operator Independent Driver Risk Retention Group, Inc.*, 461 F. Supp. 2d 757, 763 (S.D. Ill 2006)(in calculating amount in controversy, court considered punitive damages in a ratio of two to three times out-of-pocket damages). Where Defendants have made no attempt to calculate a potential damages award, it is not possible to determine what a punitive damages award might be.

---

[3] Defendants have declined to support this information with the requisite "competent proof," such as an affidavit from one of its employees or an expert. *See Meridian Sec. Ins. Coi*, 441 F.3d at 541-42 (in non-exclusive list of ways proponent of federal jurisdiction may establish amount in controversy, court finds proponent may establish amount in controversy by introducing evidence "in the form of affidavits from the defendant's employees or experts, about how much it would cost to satisfy the plaintiff's demand").

In addition, while Defendants correctly note that attorneys' fees are included in the amount in controversy calculation, in the Seventh Circuit, amounts for attorney's fees are calculated at the time federal jurisdiction is invoked. *Atteberry v. Esurance Ins. Services, Inc.*, 473 F. Supp. 2d 876, 877 (N.D. Ill. 2007)("only fees already incurred at the time that federal jurisdiction is invoked, not anticipated fees, may be counted toward the requisite amount in controversy"). Therefore, it is unlikely that, at this point, Morris's attorneys' fees contribute any substantial portion of the $5,000,000 threshold; certainly Defendants have not established that they do. (See Notice of Removal ¶¶31.)

Therefore, Defendants have not provided sufficient evidence to establish that the amount in controversy in this case exceeds $5,000,000, and removal was improper.

### C. Attorneys' Fees and Costs Should Be Awarded

Because Defendants' removal lacked an objectively reasonable basis for seeking removal, the Court should award costs and fees to the plaintiff. See, *Lott v. Pfizer, Inc.* 492 F.3d 789 (7th Cir., 2007) (explaining that plaintiff is entitled to fees if defendant "lacked an objectively reasonable basis for seeking removal.")

Respectfully submitted,

Dated:  February 1, 2008

KAMBEREDELSON, LLC

By: /s/ Myles McGuire
   MYLES MCGUIRE
   One of the Attorneys for Morris Fiddler,
   individually and on behalf of a class of
   similarly situated individuals