IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MORRIS FIDDLER, individually and on behalf of a class of similarly situated individuals,<br><br>                      Plaintiff,<br><br>v.<br><br>AT&T MOBILITY, LLC d/b/a The New AT&T f/k/a CINGULAR WIRELESS, a Delaware limited liability company, M-QUBE, INC., a Delaware corporation, and VERISIGN, INC., a Delaware corporation,<br><br>                      Defendants. | Case No. 1:08-cv-00416<br><br>DECLARATION OF NEAL S. BERINHOUT IN SUPPORT OF DEFENDANT ATTM'S MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS |

I, Neal S. Berinhout, hereby declare as follows:

1. I am employed by AT&T Mobility LLC ("ATTM") (formerly Cingular Wireless LLC ("Cingular")) as Associate General Counsel—Litigation. In that position, I have been involved with reviewing the contracts used by ATTM for the provision of wireless services, as well as the procedures for mailing amendments to all subscriber agreements, including amendments to ATTM's arbitration provisions. I am familiar with ATTM's procedures for archiving, retaining, and retrieving true and correct copies of contracts between ATTM and its customers.

2. The following facts are of my own personal knowledge, and if called as a witness I could and would testify competently as to their truth.

### Background

3.  Cingular was formed in 2000 as a joint venture owned 60% by SBC Communications, Inc. and 40% by BellSouth Corporation.

4.  In November 2005, SBC Communications, Inc. completed its merger with AT&T Corporation, forming AT&T Inc. AT&T Inc. completed its acquisition of BellSouth Corporation by December 29, 2006, thereby consolidating ownership of Cingular.

5.  Cingular Wireless was renamed ATTM on January 8, 2007.

### Arbitration Provision

6.  Since ATTM began operating (as Cingular Wireless) in October 2000, ATTM has always included an arbitration provision in the terms and conditions of service that govern its subscriber agreements.

7.  In 2006, ATTM revised its arbitration provision to make arbitration more convenient and less expensive for its customers.

8.  In creating the 2006 arbitration provision, ATTM consulted with experts, including but not limited to Professor Richard A. Nagareda, a professor at Vanderbilt University Law School whose scholarship focuses on aggregate dispute resolution. ATTM accommodated their comments when finalizing the 2006 arbitration provision.

9.  ATTM sent a copy of the 2006 arbitration provision to all of the customers that it bills on a monthly basis—including Morris Fiddler—at their billing addresses via first class mail in December 2006. In addition, as of March 2007, new ATTM wireless service agreements ("WSAs") have contained the 2006 arbitration provision. A true and correct copy of the Notice of Improved Arbitration Clause mailed to subscribers is attached as Exhibit 1.

10. ATTM also included a legend on its subscribers' December 2006 and January through March 2007 bills to remind them that the arbitration provision in their contracts had

been changed and to invite them to view information about arbitration on ATTM's web site (at http://www.cingular.com/disputeresolution or, later, http://www.att.com/disputeresolution).

11. In addition, in January 2007 ATTM modified the language in the revised arbitration provision to make it clear that customers who receive more than the amount of ATTM's last settlement offer are entitled to reimbursement of the expenses incurred in the arbitration in addition to double attorneys' fees. That clarification has been made to the version of ATTM's provision on ATTM's web site and has been included in new ATTM WSAs as of March 2007. A printout of the version of ATTM's provision posted on ATTM's web site (at http://www.att.com/disputeresolution) is attached as Exhibit 2.

12. The features of ATTM's new arbitration provision are explained on ATTM's web site at http://www.att.com/disputeresolution and at http://www.att.com/arbitration-information. (For the convenience of current and former customers, those web pages may also be accessed at http://www.cingular.com/disputeresolution and http://www.cingular.com/arbitration-information.) The web page at http://www.att.com/arbitration-information provides information designed to explain the arbitration process to non-lawyers. A true and correct copy of that document is attached as Exhibit 3.

13. Customers may download from ATTM's website all of the necessary paperwork for initiating an arbitration under the 2006 provision. Customers may use either the demand form available on the American Arbitration Association's ("AAA") website (at http://www.adr.org) or the simplified form provided by ATTM on its website (at http://www.att.com/arbitration-forms). True and correct copies of these forms are attached as Exhibits 4 and 5.

3

14. ATTM's 2006 arbitration provision provides that any arbitrations will be conducted under the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes of the AAA, as modified by the arbitration provision. True and correct copies of the current versions of the AAA Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes are attached as Exhibits 6 and 7.

15. Many disputes between ATTM and its customers are resolved before a notice of dispute is ever sent to ATTM. Customers frequently resolve their concerns by calling or e-mailing ATTM's customer care department. The vast majority of billing problems, including claims by customers that unauthorized or inaccurate charges have appeared on a bill, are quickly resolved by customer care representatives either by explaining the nature of the charges to the satisfaction of the customer or by eliminating the charges from the bill. A true and correct copy of the Notice of Dispute form provided by ATTM on its website (at http://www.att.com/arbitration-forms) is attached as Exhibit 8.

16. One way to measure how successful ATTM's customer care representatives are at resolving customer concerns and complaints is to determine the dollar value of credits "manually added" to customer accounts in response to concerns and complaints. For example, from December 2006 to November 2007 ATTM representatives provided over $1 billion in manual credits in response to customer concerns and complaints. In November 2007 alone, ATTM representatives provided about $116 million in credits.

17. The cost of acquiring a new customer is quite high, averaging several hundred dollars. This cost includes various marketing and administrative expenses and the cost of subsidizing the new customer's wireless phone. In part because of the high cost of acquiring a

new customer, ATTM generally attempts to accommodate customers who have complaints in order to retain them as customers. One of the most important metrics by which ATTM and other wireless carriers measure their success is customer "churn," which is the monthly rate at which customers terminate their relationships with the carrier. By reasonably accommodating customers who have complaints, ATTM may reduce its churn.

18. Under ATTM's 2006 arbitration provision (as well as under previous versions), customers who seek to arbitrate their disputes are required to send ATTM a notice of their dispute.

19. In 2007, ATTM received over 540 Notice of Dispute and Arbitration Initiation forms from its customers.

20. ATTM is often able to resolve customers' disputes to their satisfaction shortly after receiving notice of the disputes, thus obviating the need for the customer to commence an arbitration. In fact, ATTM generally responds to a notice of dispute with a written settlement offer.

21. If a dispute is not resolved within 30 days of the notice of dispute, the customer can initiate arbitration proceedings by completing either of the demand forms discussed in paragraph 13 and attached as Exhibits 4 and 5.

22. Under ATTM's 2006 arbitration provision (as well as under the preceding version), subscribers have the option of bringing claims against ATTM in small claims court rather than in arbitration. From 2005 through the end of 2007, over 1100 such claims were brought against ATTM nationwide. The vast majority of small-claims-court actions against ATTM settled before judgment. While many of those claims either were settled or resulted in

judgments for amounts exceeding $1,000, many subscribers have successfully vindicated claims for small dollar amounts.

**Service Agreements**

23. As a condition of obtaining wireless service from ATTM and activating wireless phones for use with ATTM's network, all customers must agree to a WSA that sets forth or incorporates by reference the terms and conditions of service.

24. ATTM has revised the terms of its standard WSA and terms and conditions of service from time to time. When a customer contracts to receive wireless service, he or she does so by accepting the then-current version of the WSA and terms and conditions of service.

25. Some ATTM subscribers are required physically to sign their WSA at a store to accept the terms of the Agreement and to activate service. Other subscribers instead must execute an electronic signature through an Interactive Voice Response ("IVR") system, which is accessed by calling a toll-free telephone number.

26. The IVR system used to execute electronic signatures on Agreements asks a series of questions. In order to execute the subscriber's electronic signature, the subscriber must select the "YES" option using a telephone keypad in response to the statement: "You agree to the terms as stated in the Wireless Service Agreement and Terms of Service." If the subscriber does not respond "YES" to this question, the IVR system will not permit the electronic signature to be executed and would decline the contract, thereby preventing service from being connected.

27. The dialogue that a customer will hear when calling the IVR system varies slightly, depending on whether the customer calls from a retail store or another location (for example, a customer may call the IVR system from home after receiving a phone he had ordered online). Attached as Exhibit 9 is a description of the IVR system containing the questions that subscribers must answer in order to execute their electronic signatures, as a customer would hear

6

those questions when calling from a retail store. Attached as Exhibit 10 is the equivalent description of the IVR system, as the customer would experience it when calling from any other location.

28.     In the course of the activation process, the subscriber receives a copy of the Agreement just completed, the Terms of Service booklet (if applicable), the rate plan, and applicable feature brochures.

## Morris Fiddler

29.     In the regular and ordinary course of business, ATTM maintains records that contain information relevant to its customers' accounts.

30.     After this litigation was commenced, ATTM employees who report to me retrieved records relating to the accounts of named plaintiff Morris Fiddler.

31.     I can provide details of Fiddler's account history based on my review of these records.

32.     According to ATTM's records, on or about November 25, 2005, Fiddler activated service with ATTM by executing his electronic signature via the IVR system. A true and correct copy of Fiddler's November 2005 WSA is attached as Exhibit 11.

33.     Fiddler's November 2005 WSA refers to and incorporates ATTM's then-current Terms of Service booklet, and Fiddler would have been provided with those terms of service at the time he received the WSA. A true and correct copy of Fiddler's November 2005 Terms of Service booklet is attached as Exhibit 12.

34.     Fiddler received a copy of ATTM's 2006 arbitration provision as an insert with the envelope containing his December 28, 2006 bill. The first page of that bill also notified him that the arbitration provision in his contract had been revised and directed him to ATTM's website (at http://www.cingular.com/disputeresolution or, later, http://www.att.com/

disputeresolution) to view more information about arbitration. A true and correct copy of the first page of Fiddler's December 28, 2006 bill, with some information redacted to protect Fiddler's privacy, is attached as Exhibit 13.

35.    The first page of Fiddler's January 2007 bill, the second-to-last page of his February 2007 bill, and the last page of his March 2007 bill contained the same notification of the revised arbitration provision that was on his December 2006 bill. True and correct copies of the first page of Fiddler's January 2007 bill and the second-to-last and last pages (respectively) of his February and March 2007 bills, with some of Fiddler's personal information redacted to protect his privacy, are attached as Exhibit 14.

36.    According to ATTM's records, on or about October 14, 2006, Fiddler activated service on a second ATTM account, again by executing his electronic signature via the IVR system. A true and correct copy of Fiddler's October 2006 WSA, with some of Fiddler's personal information redacted to protect his privacy, is attached as Exhibit 15.

37.    Fiddler's October 2006 WSA refers to and incorporates ATTM's then-current Terms of Service booklet, and Fiddler would have been provided with those terms of service at the time he received the WSA. A true and correct copy of Fiddler's October 2006 Terms of Service booklet is attached as Exhibit 16.

38.    Fiddler received a copy of ATTM's 2006 arbitration provision as an insert to the envelope containing his December 14, 2006 bill for this second account, as well. The first page of that bill also notified him that the arbitration provision in his contract had been revised and directed him to ATTM's website to view more information about arbitration. A true and correct copy of the first page of Fiddler's December 14, 2006 bill on this account, with some of Fiddler's personal information redacted to protect his privacy, is attached as Exhibit 17.

39.   The first page of Fiddler's January 2007 bill and the last pages of his February and March 2007 bills on this second account contained the same notification of the revised arbitration provision that appeared on his December 2006 bill. True and correct copies of the first page of Fiddler's January 2007 bill and the last pages of his February and March 2007 bills, with of Fiddler's personal information redacted to protect his privacy, are attached as Exhibit 18.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 5, 2008.

_/s/ Neal S. Berinhout_
Neal S. Berinhout

## CERTIFICATE OF SERVICE

I, Sarah E. Reynolds, an attorney, hereby certify that a true and correct copy of **DECLARATION OF NEAL S. BERINHOUT IN SUPPORT OF DEFENDANT AT&T MOBILITY LLC'S MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS** was served on the following counsel of record via electronic delivery on February 7, 2008:

| | |
|---|---|
| Jay Edelson<br>Myles McGuire<br>John Blim (Of Counsel)<br>KAMBEREDELSON, LLC<br>53 West Jackson Blvd.<br>Suite 1530<br>Chicago, IL 60604<br>(312) 589-6370<br><br>Bart Murphy<br>Ice Miller LLP<br>2300 Cabot Drive<br>Lisle, IL 60532<br>(630) 955-6392 | |

Respectfully submitted,

/s/Sarah E. Reynolds

Dated: February 7, 2008

*Attorney for Defendant AT&T Mobility LLC*